# Russell et al. v. Russell's Executrix et al.

(Decided February 18, 1930.)

L. C. WINFREY for appellants.

GORDON MONTGOMERY for appellees.

OPINION OF THE COURT BY COMMISSIONER HOBSON—Reversing.

The will of John O. Russell was duly probated in the Adair county court. His heirs at law appealed to the circuit court. At the conclusion of the contestants' evidence, the court overruled a motion for a peremptory instruction. The contestees then introduced their evidence, and at its conclusion they moved again for a peremptory instruction. The court refused this, and submitted the case to the jury on the question of testamentary capacity under proper instructions. The jury deliberated a short time and were discharged until morning. The next morning the court withdrew his instructions and peremptorily instructed the jury to find the paper to be the will of John O. Russell. The contestants appeal.

John O. Russell married three times. He had no children by his first two wives. He married his third wife in September, 1920. She then had three children, aged respectively, 3, 5, and 9 years. In October, 1921, Russell was found by his wife out in the yard insensible. He remained unconscious for some time, and was in a

very bad condition for several weeks, but by the last of the year he was well enough to go about town again. The will was executed January 27, 1927, and he died on April 23, 1928, after being sick about three hours. He had an estate of about $40,000. By his will he devised all of his property to his wife, Ruby Russell, during her life, with full power to use all or any part of it as she might think proper for her comfort and pleasure and with authority to sell and convey any part of the real or personal property at any time she might think necessary. After the death of his wife he devised all of the property, or its proceeds which had not been consumed, to his wife's three children, and appointed her executrix of the will without bond. A son was born to him and his wife in the year 1924, but the child did not live long. Russell had several brothers and sisters whose descendants contested the will. He was about 70 years old when he made the will.

Mrs. Laney Staples, who was a partner with him in a store he had conducted for many years successfully, testified as a witness for the appellants, to these facts: Previous to the time he had the spell in 1921, he was a very keen business man, a good judge of merchandise, kept himself posted, and was an up-to-the-minute merchant. After this spell there was as much change in him as there could have been in a person. He was not any more like himself than if he was somebody else. When he came back to the store, not only his ability had gone, but his pride had gone. He seemed at a loss to transact business. Before he had this sick spell, he never thought of sweeping the store, but he was so conscious of his helpless condition he would take a broom and start sweeping the floor. They told him they were glad to have him with them, and did not want him to do that kind of thing. Before the spell, they seldom bought anything without his approval, but after that he did not want to see the salesmen. When one would come in and he was back in the office, he would try to stay back there and try to shun them. His mind seemed to be very inactive. He could not remember anything. He often said things seemed blank. He would say, ''Things seem black to me and I can't remember.'' He seemed to have lost his ability to do things, and would ask me how to spell words. We used to go to him for things like that. On one occasion I saw an envelope addressed to the collector of internal revenue—our income tax report had been there, and

it was gone. I opened the letter, and I saw that he had put the income tax report in there and had written across the report. ''We do not handle tobacco.'' Lots of times I would open the mail. We always would investigate after we saw anything like that. We thought a great deal about him. We had the most respect for him. We were holding up four corners of the business. He was drawing one-fourth of the profits, and we thought that was not fair, so we just bought him out. We made an invoice and paid him one-fourth.

J. L. Walker, who was also his partner in the store, gave similar testimony, and so did several other witnesses, who were well acquainted with the deceased and saw him daily. All of these witnesses testified that after the spell in 1921 he did not have the capacity, at the time the will was executed, to enable him to know the natural objects of his bounty, his obligations to them, the character and value of his estate, and to dispose of it according to a fixed purpose of his own.

Dr. O. P. Miller testified: That he was in a serious condition during the spell he had in 1921. That he was unconscious and had what he diagnosed as adema of the brain, which is an accumulation of water on the brain or, what is known as softening of the brain. Adema of the brain never gets better. It is a progressive disease that gradually grows worse. He saw him from time to time after he got up. At times apparently he was normal; at other times he was not normal. The physical condition improved, but his mental condition gradually got worse until his death.

Dr. C. H. Russell gave similar testimony, although he thought it was a stroke of apoplexy or cerebral hemorrhage or something of that kind.

On the other hand, the appellees proved by a number of witnesses that after he got up from his spell he was fully himself again; that he attended to all his business as before; collected his rents and collected his income on investments; loaned money; kept his own books; and knew all about his business. He was one of the directors of the bank, and was one of three men who served on the loan committee. He had been director of the bank for years, and continued as such until he died. His associates in the bank say that his mind was all right. He was trustee of the jury fund, and had been for years. He continued such until he died, and the officers with whom he settled say his mind was all right. He was on very good

terms with all of his nephews and nieces, but the three children of his wife lived with him and had lived with him since their marriage. They were devoted to him, and he was devoted to them. They called him "Daddy," and he was the only father that the younger ones ever knew.

Under the statute, the verdict of a jury in a will case shall be given the same effect as in other civil cases. The rule in other civil cases is that, when there is evidence tending to establish the matter in issue, the court should not grant a peremptory instruction, although the judge should be of the opinion that, if the jury should find adversely to the defendant, he would be compelled to grant a new trial. Curran v. Stein, 110 Ky. 99, 60 S. W. 839, 22 Ky. Law Rep. 1575, and cases cited. It is also the well-settled rule in this state that, if there is any evidence establishing the plaintiff's claim, the question is for the jury. It cannot be maintained that there was no evidence here establishing plaintiff's claim that the testator lacked testamentary capacity. While the rule is that the opinions of nonexpert witnesses, not supported by the facts they state, and standing alone, are insufficient for this purpose, we have here expert testimony, and the facts stated by the nonexpert witnesses, considered with the expert testimony, certainly constitute some evidence that the testator was mentally incompetent. Whether the evidence is sufficient to sustain a verdict against the will is a question not now presented. Berry v. Moore, 220 Ky. 619, 295 S. W. 885; Thompson v. Jordan, 222 Ky. 788, 2 S. W. (2d) 640; Doyle v. Schafer, 228 Ky. 83, 14 S. W. (2d) 413.

The court did not err in refusing to give any instruction on undue influence. The contestants proved by one witness that the testator said he had decided to make a minister the executor of the will, but that Ruby had decided that she wanted to be the executor; but there is nothing in this to show undue influence. A man frequently talks to his wife about a matter of this sort. It is also shown that on the day the will was executed he gave the will to his wife to read, and, after she read it, he asked her if it was all right, and she said, "It is." But this does not show that she had any undue influence in the making of the will. It is not unusual for a man to show his will to his wife. This occurred after the will was made, and there is no evidence of any influence

exerted by her in procuring the will. Davidson v. Melton, 223 Ky. 145, 3 S. W. (2d) 198; Burdon v. Burdon, 225 Ky. 480, 9 S. W. (2d) 220.

Judgment reversed, and cause remanded for a new trial.